Christy **GREER**, By and Through her Father and next friend, Gary **GREER**, Plaintiff,

v.

**ROME CITY SCHOOL DISTRICT, Rome City Board of Education, and Dr. Larry B. Atwell, Ph.D. in his official capacity as Superintendent of Schools, Defendants.**

Civ. A. No. 4:89–cv–171–HLM.

United States District Court,
N.D. Georgia,
Rome Division.

Nov. 16, 1990.

Jonathan A. Zimring, Lipshutz Greenblatt & King, Atlanta, Ga., for plaintiff.

C. King Askew, J. Anderson Davis, Brinson Askew & Berry, Rome, Ga., Sam Sloan Harben, Jr., Harben & Hartley, Gainesville, Ga., for defendants.

FINDINGS OF FACT and
CONCLUSIONS of LAW

HAROLD L. MURPHY, District Judge.

I

This case came before the Court for trial of the issues without the intervention of a jury. Accordingly, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law. Before detailing the Court's findings however, it would be prudent to first set out the general framework of the law governing this case and the various contentions of the parties so that all concerned can appreciate the Court's interpretation of the complex legal and factual issues it is called upon to decide.

II

A

This case was initiated by the father of Christy Greer under the Education for All Handicapped Children's Act of 1975. 20 U.S.C. §§ 1400–1484 ("EHA" or "Act") and § 504 of the Rehabilitation Act of 1973. Christy Greer is a nine-year-old girl who

has a condition known as Down's Syndrome. This condition qualifies as a handicap under the Act.[1] The primary issue before the Court is whether the requirements of the EHA were followed when the Rome City Board of Education and the Rome City School District decided that Christy should be placed in self-contained special education class for students who have conditions similar to her own.[2] Currently, Christy is attending a traditional kindergarten class at her neighborhood school. The proposed placement is at an elementary school different than the one Christy now attends.

The Plaintiffs strongly challenge the decision to place Christy in a segregated special education class. The challenge attacks the School System's decision-making process and the legality of the proposed placement.

## B

The EHA was enacted in response to congressional concerns that a majority of handicapped children in the United States "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" H.R.Rep. No. 94–332, p. 2 (1975) *quoted in, Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1981). The Act provides federal financial assistance to state and local school boards in educating handicapped children. The receipt of the assistance is conditioned on adherence to a well articulated regulatory construct within which decisions affecting the education of handicapped children must be made. 20 U.S.C. § 1412(1)–(7); *see also,* Assistance to States for Education of Handicapped Children, 34 C.F.R. §§ 300.1–300.754 (1990). Failure to adhere to the strict regulatory requirements of the law renders any educational decision made under the EHA nugatory.

In addition to the federal regulations governing the EHA, Congress has imposed on the states the duty of establishing their own policies and procedures "that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. §§ 1412(1), 1413, and 1415; *see* O.C.G.A. § 20–2–1160(f) (directing the State Board of Education to promulgate regulations governing state compliance with the EHA). The state procedural apparatus must be exhausted before suit can be filed in the district courts of the United States. 20 U.S.C. § 1415(e)(2).

## C

The primary thrust of this case is whether Christy is receiving the "free appropriate public education" to which she is entitled under the EHA. *Id.* at § 1401(a)(18). As a handicapped child, Christy has a right to a public education specifically tailored to her special needs. This goal is accomplished through the development and implementation of an "individualized educational program." ("IEP") *Id.* at § 1414(a)(5).

Under the EHA, Congress did not attempt to define the parameters of an appropriate education for children who have a vast variety of handicaps. Instead, Congress recognized that each handicapped child faces unique difficulties demanding unique solutions. Congress therefore decided that an appropriate education should be defined individually, according to the needs of each child. This individualization is embodied in the Act's IEP requirement.[3]

---

1. The parties have stipulated that Christy is a handicapped person within the meaning of the EHA. The EHA broadly defines the term "handicapped children" to include "mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, [and] other health impaired children, [and] children with specific learning disabilities." 20 U.S.C. § 1401(a)(1).

2. The Rome City School District and the Rome City Board of Education are not differentiated in this Order and are collectively referred to as the "School System."

3. The Eleventh Circuit has extensively commented on the purpose for an IEP. For example, in *Georgia Assoc. of Retarded Citizens v. McDaniel,* 716 F.2d 1565, 1570 (11th Cir.) *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1983), the Court wrote:

The IEP, which consists of a written document, is developed at a meeting between a qualified representative of the local school system, the child's teachers, the child's parents, and, where appropriate, the child himself or herself. *See,* Individualized Education Programs, 34 C.F.R. §§ 300.340–300.349 (1990). An IEP for a handicapped child generally contains:

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Id.* at § 1401(a)(19); *see also,* Individualized Education Programs, 34 C.F.R. §§ 300.340–300.349 (1990) (describing the federal procedural requirements for IEP formulation).

Although the Act leaves to the states the substantial responsibility for developing procedures to be utilized in the formation of an IEP, it nonetheless imposes significant procedural requirements in the discharge of that responsibility. *See,* Due Process Procedures for Parents and Children, 34 C.F.R. §§ 300.500–300.556 (1990).

The formality of the procedures is a safeguard against capricious or erroneous decision making.

The Plaintiffs maintain that the Defendants have not followed the required procedures in establishing Christy's IEP. As a result, it is argued that the IEP is legally deficient and that the Court as a matter of law can find that it does not embody the most appropriate educational opportunities available to Christy. *Accord, Spielberg v. Henrico County Public Schools,* 853 F.2d 256, 259 (4th Cir.1988); *Jackson v. Franklin County School Bd.,* 806 F.2d 623, 629 (5th Cir.1986) (failure to follow prescribed procedures when developing an IEP renders it legally defective.)

In particular, the Plaintiffs contend that the School System did not properly evaluate and consider available alternatives such as supplementary services before deciding that a free appropriate public education[4] for Christy consists of segregated special education classes with occasional mainstreaming.[5]

The federal regulations also mandate that the local school agency have in place a "continuum of alternative placements." *See,* Least Restrictive Environment, 34 C.F.R. 300.551 (1990). This regulation requires each school system to have available, in appropriate situations, alternative placements and provisions for supplemental services. These supplemental services and alternative placements are designed to be used in conjunction with regular class-

---

The IEP is more than an exercise in public relations. It becomes the basis for a handicapped child's entitlement to an education in conformance with the IEP, [citation], and for a host of procedural rights in the event the child's education deviates from a mutually arrived upon IEP.

4. The EHA statutorily defines the term "free appropriate public education" to mean special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).

5. The term "mainstreaming" denotes the preference contained in the Act for educating handicapped children with nonhandicapped children to the maximum extent appropriate. 20 U.S.C. § 1412(5). In achieving compliance with the mainstreaming requirement, local school boards are directed that they must utilize supplemental aids and services in the regular classroom to the extent possible. The Act does, however, expressly provide that "the nature or severity of the handicap [may be] such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* at § 1413(a)(4); *see also, Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3038 n. 4.

room placement in order to ensure that to the extent possible a handicapped child is mainstreamed. When functioning correctly, the confluence of alternative placements and supplemental services with the principle of mainstreaming leads to an educational program that can be said to function in the "least restrictive environment." The school system must insure that these alternative placements and supplemental services are available to the extent necessary to implement the IEP. Only then will the IEP insure that each handicapped child receives an appropriate education tailored to his or her unique condition in the least restrictive environment. *Id.* at § 300.552.

In addition to challenging the procedural mechanism by which the IEP was formulated, the Plaintiffs also question whether the decision to remove Christy from her neighborhood school kindergarten class and place her in a special education class in another school was predetermined without consideration of Christy's needs and achievements. The EHA provides that a child shall be removed from a regular classroom only if education in the regular classroom with the use of supplementary aids and services, cannot be achieved satisfactorily. *Id.* at 1412(5)(B).

### D

In addition to their numerous procedural allegations, the Plaintiffs also raise several substantive challenges to the School System's decision to educate Christy in a segregated special education class. At the outset, the Court notes that the distinction between the procedural and substantive requirements of the EHA is not altogether clear. More often than not, the two spheres of inquiry dovetail imperceptibly together so that an analysis of an issue in one area necessarily resolves an issue in the other. As the Supreme Court has stated:

> It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, ...

as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, ... demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050.

The Plaintiffs contend that the IEP violates the substantive requirements of the EHA in that it is neither an "appropriate" educational plan nor is it offered in the least restrictive environment.

The federal regulations governing the EHA specifically provide that a school district shall insure that:

> (a) Each handicapped child's educational placement:
> (1) Is determined at least annually,
> (2) Is based on his or her [IEP], and
> (3) Is as close as possible to the child's home;
> (b) The various alternative placements included [in the regulation's "continuum of alternative placements" provision] § 300.551 are available to the extent necessary to implement the individualized education program for each handicapped child;
> (c) Unless a handicapped child's [IEP] requires some other arrangement, the child is educated in the school which he or she would attend if not handicapped; and
> (d) In selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs.

Placements, 34 C.F.R. § 300.552 (1990).

■ The Supreme Court has carefully canvassed the issues governing the Plaintiffs' allegation that Christy's proposed educational plan is not appropriate. In determining whether an educational plan developed under the Act is appropriate, it should

first be noted that the intent of the EHA is "to open the door of public education to handicapped children on appropriate terms [rather] than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 192, 102 S.Ct. at 3043. "Whatever Congress meant by an 'appropriate education,' it is clear that it did not mean a potential-maximizing education." *Id.* at 197 n. 21, 102 S.Ct. at 3046 n. 21. Thus, a number of courts have held that the EHA does not give a child the right to the best possible education but only the right to an appropriate education. *Accord, Springdale School Dist. #50 of Washington County v. Grace*, 693 F.2d 41, 43 (8th Cir.) *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1982).

The distinction between the "best" available education and the most "appropriate" education is not merely surplusage; indeed, it goes to the very heart of the Act's requirement that handicapped children be educated in the least restrictive environment. Often a self-contained special education class is academically superior in terms of educating the handicapped child than is a traditional classroom setting. Though placement in a special education class may be considered better for academic reasons, it may nevertheless be inappropriate under the Act because of the failure to provide for adequate mainstreaming.

■ Have made this observation, the Court is mindful of the Act's recognition that some children's handicap may be so severe that education in a regular class, even with supplementary aids and services "cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). In this situation it is clear that a child would derive no benefit from extensive mainstreaming, and accordingly, a school system is under no obligation to place a handicapped child exclusively in the regular classroom.[6]

The idea of "benefit" is crucial to determining whether a child is receiving an appropriate education in the least restrictive environment. In *Rowley*, the Supreme Court held that a state meets its burden of providing a handicapped child with a free appropriate education by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."[7] *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049.

---

**6.** The Code of Federal Regulations clearly embodies this principle when it requires that:

> (b) Each public agency shall insure:
> (2) That ... removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes ... cannot be achieved satisfactorily.

Least Restrictive Environment, 34 C.F.R. § 300.550(b)(2) (1990).

The State of Georgia through the Department of Education has adopted analogous regulations that governs the removal of handicapped students from the regular classroom. The regulations provide that:

> To the maximum extent appropriate, handicapped students of Georgia shall be educated with students who are not handicapped. [R]emoval of handicapped students from the regular classroom shall occur only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved. Further, it is the policy of the Georgia Department of Education that handicapped students have the right to be educated with their non-handicapped peers unless clear evidence is available that partial or whole removal is desirable for the welfare of the student or for other students.

Quoted from appendix "D" attached to Plaintiffs' August 24, 1990, Pretrial Brief.

**7.** The idea of "educational benefit" is not to be narrowly construed. The word "benefit" should be read in a dual context. First, it should be considered in an academic framework and the question should be asked whether a child will benefit educationally from a regular classroom setting. Second, the concept must be viewed from the nonacademic prospective. One of the many advantages of mainstreaming is the experience and behavioral models available from nonhandicapped children. In other words, although a handicapped child may not be able to absorb all of the regular educational curriculum, he or she may benefit from nonacademic experience in the regular educational environment. *Daniel R.R. v. State Bd. of Ed.*, 874 F.2d 1036, 1048 (5th Cir.1989); *accord, Roncker on Behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983).

Therefore, it is clear that when the Supreme Court in *Rowley* speaks in terms of educational benefit, it means both academic benefit and any social benefit that inures to the betterment of handicapped children when they are in contact with nonhandicapped children.

Therefore, whether a child is receiving an appropriate education in the first instance differs from whether that appropriate education is provided in the least restrictive environment.

■ Determining whether a child is receiving an appropriate education requires the Court to ask two substantive questions. First, has the state complied with the procedures set forth in the Act, and second, is the IEP developed through the Act's procedures "reasonably calculated to enable the child to receive educational benefits?" *Id.* at 207, 102 S.Ct. at 3051. If both of these queries are answered in the affirmative, then the school system can be said to have met its obligation to provide an appropriate education. This test does not, however, answer the issue of whether the designed educational program functions in the least restrictive environment.

■ The "least restrictive environment" concept requires the Court to consider the degree to which a handicapped child can be mainstreamed. In order to determine if an IEP represents an educational plan in the least restrictive environment, the Court will ask two questions. First, can education in the regular classroom with the use of sup-

plemental aids and services be achieved satisfactorily? *Daniel R.R.,* 874 F.2d at 1048. Assuming that the first question is answered in the negative, and the school system proposes to remove the child from the regular classroom, the Court must then ask the second question: Is the child mainstreamed to the maximum extent possible? *Ibid.*[8]

It is evident from the analysis of the applicable law that the Court's inquiry must proceed along two fronts, each with two subparts. First the Court must decide whether Christy is receiving the "free appropriate public education" to which she is entitled. Second, assuming that she is, the Court must then decide whether that education is taking place in the least restrictive environment.

### E

The EHA creates a complex relationship between administrative review and judicial review of decisions concerning the education of handicapped children. As the Eleventh Circuit has stated: "The standard of review to be used by the district court is somewhat confusing because the statute

---

**8.** The Court notes that the Eleventh Circuit has not yet adopted a standard to analyze compliance with the "least restrictive environment" decisions. Therefore, this Court is obligated to look elsewhere for guidance. The leading cases on the issue are *Daniel R.R. v. State Bd. Ed,* 874 F.2d 1036 (5th Cir.1989), and *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058 (6th Cir.) *cert. denied, sub nom.* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983); *accord, A.W. By & Through N.W. v. Northwest R–1 Sch. Dist.,* 813 F.2d 158, 163 (8th Cir.) *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987) (adopting the *Roncker* test).

The test adopted by this Court is essentially the same as that utilized by the Fifth Circuit in *Daniel R.R.* The test used by the Sixth Circuit in *Roncker* differs only slightly, but in a crucial area. In *Roncker,* the court concluded that:

> where [a] segregated facility is considered superior, the court should determine whether the services which make the placement superior could be feasibly provided in a non-segregated setting. If they can, [then] placement in the segregated school would be inappropriate under the Act.

*Roncker,* 700 F.2d at 1063.

The Fifth Circuit in *Daniel R.R.* correctly criticized the *Roncker* analysis as being "too intru-

sive an inquiry into the educational policy choices that Congress deliberately left to state and local school officials. Whether a particular service can feasibly be provide in a regular or special education setting is an administrative determination that state and local school officials are far better qualified and situated [to make than is the Court]." *Daniel R.R.,* 874 F.2d at 1046.

Considering the necessarily limited role that the courts should play in establishing local educational policy, it is best that parents, and state and local educators make as many of the decisions concerning primary and secondary education as possible. Given that within the Act there is language sufficient to formulate a test to determine when a particular educational plan comports with the Act's "least restrictive environment" mandate, it is best to adopt such a test since Congress has carefully drafted the language of the EHA so as to limit interference with state and local school officials. *See, Georgia Assn. of Retarded Citizens v. McDaniel,* 716 F.2d 1565, 1569 (11th Cir.) *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1983) (acknowledging the important role of local control over public education).

envisions an independent ruling based on a preponderance of the evidence, with the bulk of the evidence coming from the records of the administrative hearing." *Jefferson County Bd. of Ed. v. Breen,* 853 F.2d 853, 856 (11th Cir.1988).

The statutory authority for review by the federal courts is found in 20 U.S.C. § 1415(e)(2). The Supreme Court in *Rowley* made clear that section 1415(e)(2) is not an invitation to the court to substitute its judgment on educational policy for that made by the state at the administrative level. *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051. Writing for the Court, Justice Renquist made clear that "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to the state and local educational agencies in cooperation with the parents ... of the child." *Ibid.*

■ The Eleventh Circuit has recognized that the role of the district court "is simply to '*review* the administrative determinations contemplated by the Act'" *Breen,* 853 F.2d at 857, *quoting, Manecke v. School Bd.,* 762 F.2d 912, 919 (11th Cir. 1985) (emphasis by *Manecke* court), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986). While the Court is charged with reviewing the administrative record and preserving the preference for local decision making, it nevertheless has considerable discretion concerning the extent of deference to be given to the administrative findings of fact. *Ibid.* On appeal, its conclusions will only be reversed for an abuse of discretion. *Ibid.*

In making its decision, the Court is required to "receive the records of the administrative proceedings, ... hear additional evidence ..., and, basing its decision on the preponderance of the evidence, ... grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

### III

What follows are the broad factual contentions of the parties. The Court takes these contentions from the parties' proposed findings of facts and from the pretrial order.

### A

The Plaintiffs contend that this dispute arose because of the attempt by the Rome City School District to remove nine-year-old Christy Greer from Elm Street Elementary School, her neighborhood school, and place her in a class for moderately mentally retarded children at another facility. The Greers believe that such a move is unnecessary and too restrictive in that it removes Christy from adequate contact with non-handicapped children.

The genesis of this suit arose when Christy was initially brought to Elm Street School for enrollment in the spring of 1986. Her parents were told that Christy could not be enrolled at Elm Street since she had to be placed in a special education class due to her handicap. Based on these representations, Christy's parents did not enroll her at that time but waited until Christy was seven years old—the mandatory age for school enrollment—before bringing her back to school.

When school began in the fall of 1988 Christy was placed in a regular kindergarten program at Elm Street. After failing to convince the Greers to allow voluntary testing for Christy, the School System pursued a due process hearing to secure the right to evaluate Christy for special education. The regional hearing officer found that there was sufficient evidence to permit an evaluation, and order that an evaluation be made. The evaluation was completed in December 1988.

On January 23, 1990, and then again on February 8, 1990, the School System convened an IEP meeting to discuss their evaluation, develop an educational program and make a placement decision. The parents attended these meetings at which time they were informed that Christy qualified for special services under the EHA.

Between the January IEP meeting and the February meeting the parents sought and secured an independent evaluation of Christy by Dr. Richard Hark, a local psy-

chologist. When the IEP placement meeting reconvened in February, the parents presented Dr. Hark's evaluation which was generally consistent with the evaluation performed by the school. Dr. Hark did suggested that Christy suffers from a condition known as attention deficit disorder which depressed her I.Q. score. He also opined that Christy could receive benefit from being mainstreamed.

An IEP was eventually designed wherein the School System set out the services they proposed to offer Christy and the location where those services were to be conducted. The School System proposed to educate Christy in a self-contained class for moderately mentally retarded young students located at Southeast Elementary School. The Greers rejected the proposed IEP and sought a less restrictive placement at Elm Street.

The family requested that speech and language therapy be provided Christy at her neighborhood school. The School System initially rejected this proposal and instituted an administrative hearing to enforce its placement recommendation. The administrative process ultimately sustained the decision of the School System and this appeal followed. Only after Christy's parents filed this suit were special services in the way of speech and language therapy provided Christy at Elm Street.

The Plaintiffs challenge the entire procedure utilized by the School System in drafting Christy's IEP. They maintain that the Defendants violated the procedures of the EHA by failing to properly evaluate Christy's needs and in reaching a placement decision. Alternatively, the Plaintiffs believe that even if the EHA's procedures were properly followed that the resulting IEP and the proposed placement is not in the least restrictive environment since a proper consideration of the availability of alternative and supplementary aids was not made.

B

The Defendants contend that Christy's parents sought to enroll her in kindergarten for the first time when she was five years old. The parents in registering her revealed that she was mentally handicapped due to Down's Syndrome. The School System sought to test Christy pursuant to the terms of the EHA but her parents demurred. Eventually Christy was voluntarily withdrawn from school by her parents. The year was 1986.

In April 1988, the parents again sought to enroll Christy at Elm Street, and again on screening her to determine her readiness for kindergarten, the School System found Christy substantially delayed in intellectual development. The School System again requested leave to evaluate Christy but the parents refused. The parents were then informed that the School System intended to initiate administrative procedures under the EHA to resolve the issue regarding Christy's initial evaluation. That evaluation was eventually ordered.

Following the evaluation, two IEP meetings were held, one in January, the other in February. The parents and the School System were not in substantial disagreement as to Christy's present levels of educational performance nor was there serious disagreement with the annual long-term goals and short-term instructional objectives proposed by the School System. The disagreement arose over the proposed placement of Christy in a self-contained special education class at Southeast Elementary School. The School System proposed to place Christy in Southeast Elementary with mainstreaming opportunities for physical education, lunch, music and other activities for non-handicapped kindergarten students. The parents continued to resist the IEP proposed by the School System.

At loggerheads, the School System initiated the administrative apparatus necessary to force the implementation of the IEP which it had designed. The Defendants sought and obtained an administrative finding that in all respects the IEP that it had developed met the requirements of the EHA.

The School System's position is simple, they contend that the EHA has been fully complied with both procedurally and substantively, and that Christy's handicaps are

of such a nature and severity that education in the regular class cannot be achieved satisfactorily or appropriately even with the use of supplementary aids and services. The Defendants believe that the proposed placement at Southeast Elementary is in the least restrictive environment and represents the most appropriate free public education that can be provided.

### IV

The parties have entered into the following relevant stipulations:

1. Christy is a handicapped person within the meaning of the EHA.

2. Christy is a nine year old girl who is a handicapped child due to a disability known as Down's Syndrome. Christy is mentally handicapped, although the extent of her handicap is disputed. The parties do not dispute that Christy is entitled to special education services as defined by the EHA.

3. Christy has been enrolled in the Rome City School System for the school years 1988–89 and 1989–90. During this time, Christy has been served in the regular kindergarten class at Elm Street Elementary School.

4. All administrative remedies required by the EHA have been exhausted and this action and all issues presently in dispute by the parties are properly before the Court pursuant to 20 U.S.C. § 1415(e)(2) and (4).

5. Pending a final resolution of all proceedings, Christy has remained in the regular classroom pursuant to 20 U.S.C. § 1415(e)(3).

### V

Having considered the administrative record and the evidence presented at trial, the Court makes the following findings of fact:

### A

1. Christy Greer is a nine year old girl who lives in Rome, Georgia within the area served by the Rome City School System. She has a condition commonly referred to as Down's Syndrome and a moderate to severe speech and language impairment.

According to the evaluation performed by both the School System and the parents' psychologist, Christy has an I.Q. score that indicates that she is mentally handicapped.[9] Due to Christy's mental handicap, she is significantly delayed in the development of speech and language skills.

2. Christy is eligible for services under the EHA since under the Act's provisions she qualifies as handicapped.

3. Christy's parents initially sought to enroll her in a kindergarten class Elm Street Elementary School in 1986 for the 1986–87 school year. Christy was five years old. The parents in registering her for school revealed that she had Down's Syndrome and as a result her behavioral and language development was deficient.

Learning of this disability, the School System sought to evaluate Christy to determine her level of performance. The parents resisted this effort and eventually decided to voluntarily withdraw Christy from kindergarten.

4. The Greers brought Christy back to Elm Street for enrollment in 1988 when she was seven years old—the mandatory age for school enrollment. The School System again requested that Christy be evaluated but the parents refused. The System informed the parents that they intended to initiate administrative procedures under the EHA to compel Mr. and Mrs. Greer to allow the testing of their daughter.

5. Pursuant to State regulations, on August 30, 1988, a hearing was conducted before a regional hearing officer to determine the right of the School System to evaluate Christy to determine her educational needs. After hearing evidence,

---

**9.** There is disagreement among the parties as to the exact extent of Christy's mental handicap. The Plaintiffs argue that Christy is only mild mentally handicapped, while the Defendants contend that she is moderately handicapped.

As the Plaintiff has acknowledged, however, this argument may be a distinction without substance since the School System has admitted that Christy's proposed placement is not based on I.Q. score.

the regional hearing officer concluded that the School System had a right under the EHA to evaluate Christy. From this decision, the parents appealed to the state hearing officer for a review.

6. The decision of the state regional hearing officer was affirmed by the state hearing officer and the School System was given the right to evaluate Christy. The evaluations took place in December 1988 and again in January 1989.

7. Pursuant to the notice required by the EHA, a placement committee meeting was convened by the School System on January 23, 1989, to discuss the evaluation and to develop an IEP and make a placement decision. Mr. and Mrs. Greer were in attendance at this meeting.

8. At the January meeting, the District indicated that Christy was eligible for special education services designed for the mentally handicapped and those suffering from speech and language deficiencies. At this meeting there was considerable discussion concerning the proper instructional program for Christy and the appropriate educational placement. The parents and the School System were in substantial disagreement as to the School System's proposal for placing Christy in a classroom for mentally handicapped students at Southeast Elementary School. No conclusive decision was made and the meeting was adjourned until February 8, 1989.

9. Between the January 23rd meeting and the February 8th meeting Christy's parents had her privately evaluated by Dr. Richard Hark, a psychologist practicing in Rome, Georgia. When the placement meeting reconvened on February 8, 1989, the Greers present Dr. Hark's evaluation. Dr. Hark's evaluation is generally consistent with the evaluation performed by the School System, though he believes that Christy also suffers from a condition known as attention deficit disorder which adversely depressed her I.Q. score.

The Court does not find the evidence presented by the Plaintiffs concerning Christy's alleged attention deficit and its effect on her full scale I.Q. score to be particularly relevant or creditable. Even if the Court were to accept as creditable the statements of Dr. Hark that Christy suffers from an attention deficit, by his own admission, Dr. Hark has admitted that Christy nevertheless suffers from mild mental retardation. Consequently, Christy is still eligible for all services under the EHA and the analysis of the Court is not changed by the findings of Dr. Hark.

10. During the February 8, 1989, meeting the School System again proposed an IEP which sought to place Christy at Southeast Elementary in a self-contained class with mainstreaming opportunities for lunch, physical education and music. The parents balked at the idea and rejected the School System's offer of mediation. Instead, the parents sought to have speech therapy provided for Christy at Elm Street.

Following the refusal of the parents to agree to the implementation of the IEP, the Defendants sought administrative review under the EHA of its proposed IEP and placement.

11. On March 6, 1989, a hearing was conducted by a regional hearing officer. The parents sought a delay in the proceeding in order to obtain counsel. No delay was granted though the parents were represented by an advocate for the handicapped experienced in such hearings.

On March 10, 1989, the regional hearing officer entered a decision finding the IEP developed by the School System was calculated to enable Christy to make educational progress. The hearing officer also found that the placement of Christy in a self-contained class at Southeast Elementary with the proposed opportunities for mainstreaming was an appropriate education in the least restrictive environment.

12. The parents retained counsel after the decision of the regional hearing officer and appealed his decision to the state hearing officer. The state hearing officer affirmed the ruling of the regional hearing officer in all respects. This appeal then followed.

13. Throughout the entire administrative appeal process, and the pendency of the current litigation, Christy has remained

in a regular education kindergarten class at Elm Street Elementary School. She is currently receiving speech and language therapy from a speech pathologist assigned to the school. These services were begun in the 1989–90 school year.

14. The Court has carefully considered the administrative record and the evidence produced at trial. The Plaintiffs raise serious procedural challenges to the School System's development of the IEP. The heart of the challenge is that the IEP committee never seriously entertained alternative placements other than the proposed self-contained program at Southeast Elementary. The Plaintiffs also contend that the IEP committee never discussed specific aspects of services that could be made available for Christy at Elm Street.

■ The Court has reviewed the entire record in this case and pondered mightily over the procedural issues raised by the Plaintiffs. The Court remains unconvinced, however, that procedural violations of any moment in the development of Christy's IEP exist. The Court finds that the School System fully complied with the requirements of the EHA in formulating Christy's IEP. The Court further finds

that the *educational program* proposed by the School System is reasonably calculated to achieve an educational benefit for Christy. Therefore, under *Rowley* and its progeny, the Court concludes that the School System has developed an educational program that provides Christy with a "free appropriate public education."

### B

■ Having decided that the School Board developed an appropriate IEP in accordance with the procedures provided for by the EHA, the next issue is whether the designed program functions in the least restrictive environment. Based on the facts below the Court finds that it does not.[10]

15. Christy has been enrolled in Ms. Ruth Cain's kindergarten class at Elm Street Elementary since 1988. The preponderance of the evidence at trial establishes that over the last two years Christy has improved academically. Much of this improvement is due to individual efforts of Ms. Cain.

16. This year Christy began to receive speech therapy several times a week from

---

**10.** This case has given the Court considerable pause. While the Court is confident that it has properly applied the law, the resolution reached in nonetheless troubling. Christy is now nine years old and still in kindergarten. There is no dispute that her academic development is limited to the mastery of only the most rudimentary skills. There is uncontradicted testimony that Christy's academic proficiency will not exceed the second or third grade level—and this level of attainment will take years to achieve. Even though Christy has made academic progress since attending kindergarten at Elm Street Elementary School, it is not at all certain that she will continue to do so. The appropriateness of her placement at Elm Street depends in large measure on whether she continues to progress academically, and whether she reaches a stage were her chronological age or behavior simply become too disruptive in the regular classroom.

It is simply unrealistic to expect Christy when she reaches 11 or 12 years of age to still be in kindergarten or first grade at Elm Street with nonhandicapped children. It is likewise unrealistic to expect the School System to advance her from grade to grade with children of her own age when her academic and behavioral skills lag far behind. Such a case would likely present a

situation under the EHA where education in the regular classroom setting could not be achieved satisfactorily even with supplemental aids.

The Greers' own expert, Dr. Hark, commented that Christy's success in a mainstream educational environment depends on her ability to successfully adapt to the regular classroom. As Dr. Hark states:

There is no doubt that [Christy] suffers from mild mental retardation and ... will require an enormous amount of repetition to teach her very simple academic skills. Obviously, if she needs constant one-to-one attention and instruction from an aide during the ... academic year, then the school system will have no other option [but to place her in a self-contained class].

Defendant's Exhibit 59 at 4.

Whether Christy can continue to make progress at Elm Street past this year or next is very much an open question. Within a very short time, the legal theories which now mandate that Christy remain at Elm Street may very well compel the opposite result.

The Court's decision is based on the evidence and law as it existed at the time of trial. What the Court orders done this day may not be in the best interest of Christy—that however is not the issue.

a speech pathologist at Elm Street. This therapy has aided her development considerably and the Court finds that Christy has made substantial educational progress as a result.[11]

17. There is no evidence that at this time Christy is unusually disruptive in the classroom or that she takes a disproportionate amount of the teacher's attention.

18. At the current time, the Court finds that the School System can adequately educate Christy in the regular kindergarten classroom with the appropriate use of supplementary aids and services, in particular language and speech therapy.[12]

19. The proposed placement of Christy at Southeast Elementary is not the least restrictive environment in which Christy can be educated and does not sufficiently provide for appropriate mainstreaming.

### VI

The Court adopts its discussion in section II as its conclusions of law, but makes the following additional specific findings:

1. The School System has complied in all respects with the procedures set forth in the EHA and in the State regulations for developing Christy's IEP. The Court makes this determination based on a preponderance of the evidence.

2. Within the meaning of the EHA, the proposed IEP represents an adequate "free appropriate public education." The proposed IEP placement at Southeast Elementary is not, however, in the least restrictive environment.

3. With the use of supplemental services, Christy can receive an educational benefit from remaining in her kindergarten class—at least for the immediate future.

4. The Court's decision that the School System's proposed placement is not in the least restrictive environment does not invade the provence of educators in developing educational methodologies. It is simply a legal conclusion that the requirement of the EHA that all educational placements be in the least restrictive environment is not satisfied.

5. Plaintiff's § 504 claims under the Rehabilitation Act of 1973 are identical to their claims under the EHA and therefore the Court need not address them. *See, Doe v. Alabama State Dept. of Educ.,* 915 F.2d 651, 666 (11th Cir.1990).

### VII

ACCORDINGLY, the proposed placement of Christy in South East Elementary School is not in conformity with the EHA's requirement. Therefore, the Clerk is DIRECTED to enter judgment in favor of the Plaintiffs. The parties are encouraged to reconvene an IEP meeting and discuss Christy's placement in terms of the Court's findings.

IT IS SO ORDERED.

---

**11.** While Christy has made substantial progress at Elm Street, the Court does not find the evidence to suggest she has yet mastered those cognitive skills necessary for her to learn in the first grade.

**12.** Were the Plaintiffs asking the Court to find that Christy should be advanced to a class of children her own age the Court would likely find that the curriculum modification needed in order for Christy to be contained in such a classroom would be so extensive as to be impractical.