Gregory G. URBAN, by Ronald and Janice URBAN, Plaintiff,

v.

JEFFERSON COUNTY SCHOOL DISTRICT R–1, Defendant.

Civ. A. No. 93–S–908.

United States District Court, D. Colorado.

Dec. 3, 1994.

**1560**

William R. Baesman, Gorsuch Kirgis, LLC.

Gerald A. Caplan, Alexander Halpern, Susan S. Schermerhorn, Alan J. Canner, Caplan and Earnest, Boulder, CO.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER comes before the Court on the Defendant's motion for summary judgment, filed January 18, 1994. Plaintiff filed his response to the motion on February 14, in which he moved for summary judgment on his seventh claim for relief. This Court heard oral argument on these motions on May 6, 1994. After oral argument, the Court submitted to counsel questions for fur-

ther briefing. The Court now makes the following Order.

This action is brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), at 20 U.S.C. § 1415(e)(2), the Americans with Disabilities Act ("ADA") at 42 U.S.C. § 12101–12213, the Rehabilitation Act, at 20 U.S.C. § 794, and 42 U.S.C. § 1983. Plaintiff Gregory Urban ("Gregory") seeks injunctive relief. As stated in a previous order entered in this action, this case involves claims arising out of the Defendant's refusal to place the Plaintiff at the high school of his choice. The claims remaining are the first, second, third, fourth, fifth, and seventh claims for relief. The sixth and eighth claims of the second amended complaint were dismissed by Judge Finesilver on December 27, 1993, and he denied the Plaintiff's motion for preliminary injunction on August 12, 1993. This case was transferred to the undersigned judge on February 23, 1994. Gregory, through his parents, seeks relief for the Jefferson County School District's alleged violations of the IDEA, the ADA, the Rehabilitation Act, and for violation of civil rights pursuant to 42 U.S.C. § 1983. He has requested (among other things) injunctive relief to compel his placement at Evergreen High School and implementation of community-based education and transitional services in Evergreen, as well as injunctive relief entitling him to compensatory education after age twenty-one for the period of time during which he was denied a free appropriate education pursuant to the IDEA.

### Background

Under the IDEA, 20 U.S.C. § 1415(e)(2), an IDEA decision of a state educational agency can be appealed in federal court.[1] The disputes in this case revolve around where Gregory will receive his education and training which are designed to assist him in acquiring skills to live independently. The Defendant contends that his educational placement at Golden High School (in the nearby community of Golden) is appropriate, while his parents argue that he should re-

1. *The term "appeal" is used guardedly here, due to the nature of review undertaken by the district* *court. The issues concerning standard of review are discussed in further detail below.*

ceive all elements of his educational and training services in the community in which his family lives—Evergreen, Colorado.

Fairly extensive factual findings were made in Judge Finesilver's order of August 12, 1993, in which he denied Plaintiff's motion for preliminary injunction. These fact findings, as well as those of the Administrative Law Judge in his order of February 19, 1993, will not be disturbed by this Court. The Court will, for the purposes of this order, simply reiterate some relevant facts. Plaintiff Gregory moved to this state with his family in November 1991. He and his family reside in Evergreen, located in unincorporated Jefferson County and within the Defendant school district. Since his arrival in the school district, he has attended Golden High School (a high school he would not attend were he not disabled) and has participated in the "Challenge Program" there. The Challenge Program is designed to provide education and support services to children with relatively severe disabilities. This program serves less than 1% of the total student population, and it is designed to provide the most intensive special education services in order to obtain some educational benefit. Testimony of Robert Fanning, Impartial Hearing Officer transcr. at 591. Gregory apparently functions overall at the level of a two- to three-year-old. He is presently 19 years of age. As part of the Challenge Program, Gregory has participated in jobsite training, known as "shadowing," where he has done floor sweeping and vacuuming at a Pizza Hut (in Golden) and has delivered newspapers for the *Golden Transcript.* At Golden High School Gregory also participates in "P.E. Plus," an adaptive physical education program. Neither the Challenge Program nor the P.E. Plus program is offered at his neighborhood high school, Evergreen High School. There are three types of special education programs at Evergreen High School, but because the District has identified Gregory's disabilities as "trainably mentally handicapped," he is not eligible for participation in Evergreen High School's programs (its programs appear to be limited in scope to children identified as "educably mentally handicapped").

Sixty percent of Gregory's program is implemented in Golden or Golden High School. Approximately thirty percent of his weekly program is spent in regular education classes at Golden High, where he is accompanied at all times by a one-on-one teaching assistant. The rest of his time in Golden is divided between special education programs (the Challenge Program) and other educational services in that community. The remaining forty percent of services are provided in Evergreen by a one-on-one teaching assistant (where he does not attend either regular or special education classes). The Challenge Program, as well as the jobsite training and any related transitional services Gregory might receive, are designed to prepare him for the world beyond the school setting. Gregory's parents are understandably concerned that he become integrated in his home community of Evergreen, as opposed to Golden, and that the level of skill transferability regarding his jobsite training and other activities will not translate from the Golden setting to the Evergreen setting. Plaintiff's parents assert, among other things, that the District's decision to transport him to Golden denies him the opportunity to make friends in his own community through relationships and classes at Evergreen High.

The Plaintiff's complaint presents some claims of first impression which involve the interplay between Title II of the ADA (under which the Plaintiff asserts he has a right to reject education and services at Golden High School and the right to choose delivery of such education and services at Evergreen High School) and the statutory constructs of the IDEA and § 504. The claims remaining are as follows:

1) Gregory has the right, as a matter of law, to be placed at Evergreen High School;

2) Gregory's placement in the Challenge Program was improper because his Individual Education Program did not specifically require such restrictive placement (34 C.F.R. § 300.552(c));

3) Gregory is entitled as a matter of law to have his transition services focused on his post-school environment of Evergreen;

4) The Impartial Hearing Officer and Administrative Law Judge erred by ordering a new IEP staffing and not directing Gregory's placement at Evergreen High School (the location of transition services should be Evergreen, therefore the educational placement there is also appropriate);

5) Defendant's refusal to provide transitional services to Gregory in Evergreen (and apparently also educational services) and its requirement that Gregory attend the Challenge Program and some transitional programs in Golden amount to discriminatory practices in violation of the ADA and 42 U.S.C. § 1983; and

7) Defendant refused to develop an appropriate IEP including a statement of transition services and provision for an extended school year until May 4, 1993, and thereby knowingly denied benefits and services in violation of the IDEA, the ADA, the Rehabilitation Act, and 42 U.S.C. § 1983.

The Court will now examine Plaintiff's claims relative to these statutes.

### I. Statutory Framework

#### A. The IDEA

Consideration of the Plaintiff's claims requires interpretation of a dense complex of federal and state statutes and regulations. An overview of the IDEA is thus in order. The IDEA, formerly known as the Education for All Handicapped Children Act, provides federal money to state and local agencies for the education of children with disabilities to ensure they are given

a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, to assist States and localities to provide for the education of all handicapped children, and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. § 1400(c). It conditions federal funding on compliance with certain goals and procedures. 20 U.S.C. § 1412. The statute's primary purpose of providing a free appropriate public education ("FAPE") is achieved through the development of an individualized education program ("IEP"), tailored for each child with a disability. 20 U.S.C. § 1401(a)(18)(D).

In *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court examined the issue of what is meant by the term "free appropriate public education" (FAPE), as well as what the role of courts is in exercising review under § 1415 of the IDEA. 458 U.S. at 186, 102 S.Ct. at 3040. That decision held that the statutory definition of FAPE, in addition to requiring the states to provide each child with specially designed instruction, expressly requires the provision of such supportive services as may be required to assist a handicapped child to benefit from special education. 458 U.S. at 201, 102 S.Ct. at 3048. It also noted, that the requirement that a state provide specialized educational services to disabled children generates no additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children, and rejected the argument that the goal of the act is to provide each disabled child with an equal (to non-disabled) educational opportunity. 458 U.S. at 196, 102 S.Ct. at 3045. It is designed to provide a floor, not a ceiling. This was reiterated in *Board of Education of Sch. Dist. 21 v. Illinois State Board of Education*, 938 F.2d 712, 715 (7th Cir.1991) *cert. denied* 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1993), where the court held that the purpose of the act is to open the door of public education to disabled children, not to educate a disabled child to his or her highest potential. Citing *Rowley*, 458 U.S. at 192, 102 S.Ct. at 3043. Finally, the *Rowley* court observed that courts must be careful to avoid imposing their view of preferable educational methods upon the states. 458 U.S. at 207, 102 S.Ct. at 3051.

Due to the individualized nature of the educational and other services provided to each disabled student, the implementing regulations are of some assistance here in making the case-by-case determination of whether a disabled student is receiving FAPE in compliance with the IDEA. These provide that a school district shall insure that:

(a) Each handicapped child's educational placement:

 (1) Is determined at least annually,

 (2) Is based on his or her IEP, and

 (3) Is as close as possible to the child's home;

(b) The various alternative placements included [in the regulation's continuum of alternative placements provision] in § 300.551 are available to the extent necessary to implement the individualized education program for each handicapped child;

(c) Unless a handicapped child's [IEP] requires some other arrangement, the child is educated in the school which he or she would attend if not handicapped; and

(d) In selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs.

Placements, 34 C.F.R. § 300.552 (1992), referring to 20 U.S.C. § 1412(5)(B).

The IEP is prepared (annually) at a conference including the student's parents or guardians, a representative of the local educational agency, and, when appropriate, the child. 20 U.S.C. § 1414(a)(5).[2] The IEP consists of a written document containing:

(A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(a)(19); 34 C.F.R. § 300.346 (1992).

In addition to these substantive provisions, the IDEA contains numerous procedural safeguards, including parental notification of proposed changes to "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." A parent or guardian may bring a complaint on any matter relating to such evaluation or placement. 20 U.S.C. § 1415(b)(1)(C)–(E). Once a complaint is brought, the parent is entitled to a due process hearing, conducted by an educational authority, as prescribed by state law. 20 U.S.C. § 1415(b)(2). In this case, the Plaintiff had a hearing before an impartial hearing officer ("IHO") (exh. A to Plaintiff's second amended complaint), and an appeal (and cross-appeal) to an administrative law judge ("ALJ") (exh. D to Plaintiff's second amended complaint), in which the ALJ took additional evidence. These hearings were conducted pursuant to Part II, Section B VII of the Fiscal Years 1992–94 State Plan of the Colorado Department of Education.

The IHO rendered a decision in which she found that Gregory's IEP was inadequate because it failed to provide transitional services and that services for his acquisition of job training skills may need to be provided in Evergreen rather than Golden because of Gregory's difficulties transferring such skills. IHO decision at 10. She found that Gregory was receiving an appropriate education in the Challenge Program, but also that he might also receive such appropriate education at Evergreen High School, and that it should have been offered as an alternative. IHO decision at 11. The IHO concluded that: Gregory's parents did not give their informed consent to their son's IEP and the school officials should make efforts to accommodate his parents' work schedules to allow their participation; the offering of only two placement options was improper; the Plaintiff's IEP suffered from procedural defects; and transition services should be provided in Evergreen. Her decision stated that Gregory had not been provided a FAPE due to the lack of provision of transitional services in his IEP, and that placement in the Challenge Program should be made only after consideration of a continuum of alternatives, and only

2. *Gregory's IEP is attached as exhibit C to Defendant's response to the Plaintiff's motion for pre-* *liminary injunction.*

if required by his IEP. IHO decision at 15–16.

In the appeal of the IHO's decision, the ALJ gave deference to the IHO's fact findings, adopted them, and went on to make additional findings after hearing evidence. This additional evidence concerned a comparison of services available at the Challenge Program at Golden High School and those available at Evergreen High School. The ALJ's additional findings also noted disagreement among witnesses as to whether it was appropriate to limit Gregory's transition services to a single environment (Evergreen). ALJ decision at 7. The ALJ rejected Gregory's parents' argument on appeal to the ALJ that, as a matter of law, Gregory was entitled to placement at Evergreen High School. The ALJ agreed with the IHO's decision regarding the offering of more placement alternatives to Gregory, and the ALJ, like the IHO, ordered that remand was the most appropriate remedy. He concurred with the IHO decision that Gregory was receiving an appropriate education at Golden High School. The decision noted that the preference for placing a student in a neighborhood school is not a mandate, but merely one factor to be considered in a placement decision. ALJ decision at 10. Even if the transition services are properly provided in Evergreen, the ALJ noted, it does not necessarily follow that Gregory must attend high school in Evergreen. ALJ decision at 12.

The ALJ overruled the IHO's decision determining that the appropriate locale for transition services was Evergreen. He agreed with the Defendant that this was an intrusion into the domain of the IEP staffing committee. The ALJ's decision was to remand the matter to the school officials to reconvene a new IEP staffing for several purposes: (1) to consider whether services available in Evergreen could be utilized for Gregory's IEP (ALJ decision at 15); (2) to specifically identify Gregory's post-school environment—not necessarily Evergreen—after consideration of all relevant factors (ALJ decision at 16); and (3) to hold a staffing with the accommodation of Gregory's parents' work schedules so that they might be encouraged to attend and participate. The

ALJ's decision directed that the staffing take place within fifteen days of his order. Between February 26, 1993, and through May 4, 1993, meetings were held to design an appropriate IEP which would include, among other things, a statement of transition services. Pretrial order at 4. The meetings apparently encountered difficulties when the school officials refused to consider fashioning an IEP based on Gregory's attendance at Evergreen High School, and the parties disagreed on what the proper considerations were for determining Gregory's entitlement to education and services for an extended school year. Plaintiff's claims require a limited review of the ALJ's decision, but a more extensive review of the law applicable to the provision of his education, primarily the IDEA.

### B. Section 504 of the Rehabilitation Act

Plaintiff's claims under this statutory section are listed in tandem with the claims founded upon the IDEA and the ADA. Section 504 of the Rehabilitation Act (29 U.S.C. § 794) provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be denied the benefits of, or be subjected to discrimination under any program receiving federal financial assistance. The Plaintiff relies heavily on the decision of the Tenth Circuit in *New Mexico Ass'n for Retarded Citizens v. New Mexico*, 678 F.2d 847 (10th Cir.1982). That decision is readily distinguishable from the issue in the present case for several reasons set forth at 678 F.2d at 853–54. Even if this Court found that decision to be applicable here, it is clear that under that decision, § 504 and its regulations were designed to prohibit discrimination rather than to require affirmative action.

### C. Title II of the Americans with Disabilities Act

Plaintiff asserts that the ADA represents the newest generation of anti-discrimination laws for protecting the rights of the disabled, and accordingly that the ADA adds to the existing statutory protections already contained in the IDEA and the Rehabilitation Act. The Court must therefore consider

whether, under the ADA, Gregory's parents have the right to refuse education and services provided to Gregory in Golden pursuant to an IEP. His parents contend that he is precluded from the opportunities of the non-disabled because he is receiving his education at Golden High School in the Challenge Program. Plaintiff also contends that the rights and remedies asserted under the ADA do not affect the IDEA framework. In support of his IDEA claim, he cites to 28 C.F.R. § 35.130(b)(1) and (2), which pertain to prohibitions against limiting rights and opportunities to an otherwise qualified individual with a disability ((b)(1)), and the provision of reasonable modification necessary to avoid discrimination ((b)(2)). Specifically, Plaintiff asserts that the Defendant's refusal to avoid discrimination by making reasonable modifications to its existing programs at Evergreen High School amounts to a violation of 28 C.F.R. § 35.130(b)(7). This, Plaintiff argues, amounts to a violation of both the ADA and § 504 of the Rehabilitation Act. Plaintiff's supp. brief at 8.

## II. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that judgment "... shall be rendered forthwith if the pleadings, depositions, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The rule further provides "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegation or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

In a trilogy of cases, the United States Supreme Court has set forth standards for the consideration of summary judgments. Justice Powell in *Matsushita Electric Industrial Company Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) emphasizes that in the face of a summary judgment, the non-movant must come forward with specific facts showing a genuine issue for trial. Justice White in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) gives a thorough discussion of the Court's position on what constitutes "genuine issues of material fact" precluding the entry of summary judgment. It was made clear that a Plaintiff may not rest on mere allegations to get a question to a jury without *significant probative evidence* tending to support the complaint. (Emphasis added.) *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510, citing *First National Bank of Arizona v. Cities Service,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Finally, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), it was made clear that in the absence of a showing of every element essential to the party's case, summary judgment may enter. There can be no genuine issue as to any material fact on a failure of proof concerning an essential element of the nonmoving party's case. In such situation all other facts are deemed immaterial and the moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an element with respect to which he bears the burden of proof.

Rule 56 requires the nonmoving party to go beyond the pleadings by affidavit, deposition, answer to interrogatories, or other method and designate specific facts to show that there is a genuine issue for trial. A genuine issue of material fact exists only where there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 429 (10th Cir.1990).

In analyzing whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the nonmovant. *Nationwide Mutual Insurance Co. v. United States,* 3 F.3d 1392, 1394 (10th Cir.1993). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Telephone Co.,* 933 F.2d 891, 892 (10th Cir.1991). Once the movant

has made an initial showing, the burden of going forward shifts to the opposing party. The nonmovant must go beyond the pleadings and designate specific facts showing genuine issues for trial on every element challenged by the motion. *Tillett v. Lujan,* 931 F.2d 636 (10th Cir.1991). However, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), the nonmovant must come forward with specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). All justifiable inferences are to be drawn in the nonmovant's favor, and the nonmovant's version of any disputed fact is presumed correct. *Eastman Kodak Co. v. Image Technical Services, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992).

### III. Discussion

This case is about whether Gregory's parents can compel his admission to Evergreen High School. The Court must consider in particular questions relating to the IDEA— whether Gregory is receiving a free appropriate public education in the least restrictive environment, and whether he is entitled to compensatory education, as well as claims relating to both the IDEA and the ADA— whether Gregory has the right, as a matter of law to compel the school district to enroll him at Evergreen High School and provide him transitional services there.

### A. Standard of Review and Burden of Proof Under IDEA

 The standard of review for actions brought under the IDEA is a modified *de novo* review. In *Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982), the Supreme Court indicated that a complete *de novo* review is inappropriate. Something short of *de novo* review is appropriate. *G.D. v. Westmoreland School Dist.,* 930 F.2d 942, 945–6 (1st Cir.1991) (citation omitted). The Sixth Circuit has held that the language in the IDEA

is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. *Thomas,* 918 F.2d at 624. In *Roncker ex rel. Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.) *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983), the Sixth Circuit explained that the district court should give "due weight" to the state administrative proceedings in reaching its decision. Because Colorado's State Plan for implementation of the IDEA (1 Colo.Code Regs. 301–8, § 6.03) provides a multi-tiered process of hearing and review for disputes concerning the education of disabled children, this Court will review the decision of the ALJ. *Thomas v. Cincinnati Board of Education,* 918 F.2d 618, 624 (6th Cir.1990).

 With respect to the issue of who bears the burden of proof, the Court must look to the nature of the challenge to the IEP. Where a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is "appropriate" rests with the school district. *Fuhrmann v. East Hanover Board of Education,* 993 F.2d 1031, 1035 (3d Cir.1993), (citation omitted). This burden of proof is contrasted with the allocation where the issue is whether the IEP is appropriate. In this situation, the student or his parents bear the burden of proving by a preponderance of the evidence that the IEP devised by the school authorities is inappropriate. *Doe v. Board of Education of Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994) citing *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir.1990). The burden is also on the Plaintiff here as he is challenging the outcome of the administrative procedures. *Board of Education v. Illinois State Board of Education,* 938 F.2d 712, 716 (7th Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992). The IHO's decision, at 4, points out that Plaintiff had conceded that, as the party attacking a student's placement, he bore the burden of proof.

## B. Compliance with IDEA

In *Rowley* (458 U.S. at 181, 102 S.Ct. at 3038), the Supreme Court set forth a two-part test to determine whether a child has been provided with a FAPE as defined by the act:

1) Whether the state complied with the procedures set forth in the act; and

2) Whether the IEP developed through the act's procedures is reasonably calculated to enable the child to receive educational benefits?

■ With regard to the first prong, procedural defects are not sufficient to render the IEP inappropriate if the parents and district are aware of the relevant information. *Chuhran v. Walled Lake Consolidated Schools,* 839 F.Supp. 465, 471 (E.D.Mich. 1993). Procedural noncompliance with IDEA will be deemed violative if it results in substantial deprivation. *Id.* at 473, citing *Cordrey v. Euckert,* 917 F.2d 1460 (6th Cir. 1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991). In *Chuhran,* the district court held that the plaintiff had been provided with adequate transition services in spite of the district's failure to document them. 839 F.Supp. at 473.

Concerning the second prong, whether the IEP was reasonably calculated to enable the child to receive educational benefits, this concerns the question of substantive compliance. Here the court must refer back to the question of providing a FAPE. As part of the FAPE, the act requires that states and localities determine the educational needs of each disabled student through the preparation of an IEP. 20 U.S.C. § 1414(a)(5). Apart from the contents specified in 20 U.S.C. § 1401(a)(19), it must also specify the present levels of educational performance of the child, specific educational services to be provided, a statement of the needed transition services, and the criteria for progress evaluation. 20 U.S.C. § 1401(a)(20).

■ In examining this issue, the Court must conclude that the findings and conclusions of the ALJ are especially helpful here. With regard to the failure (for a limited period of time) to provide transitional services, the ALJ held that this was a procedur-

al defect and the appropriate remedy was to remand for completion of the IEP. ALJ decision at 11. The ALJ also correctly concluded that, even if it is proper for certain transitional services to be provided Gregory in Evergreen, it does not necessarily follow that he must attend high school in Evergreen. The Court concurs with this conclusion. ALJ decision at 12–13. Finally, in his discussion of a related FAPE issue of identification of post-school environment, the ALJ observed that, although it would be surprising if the staffing team were to identify a post-school environment other than Evergreen, the determination of this was properly made by the staffing team on remand. Therefore, in light of all the evidence before it, including the administrative decisions rendered by the IHO and the ALJ, this Court must conclude that Gregory is receiving a free appropriate public education, and that the unresolved issues concerning his post-school environment, as well as the location of his transitional services, must be determined by the IEP staffing team on remand.

■ In addition to the FAPE considerations outlined above, another cornerstone of the IDEA is the provision of education and related services in the least restrictive environment. The Code of Federal Regulations embodies the principle that mainstreaming of disabled children is strongly preferred, and acknowledges that where the disability is so severe that education in a regular class, even with supplementary aids and services, that mainstreaming is of no benefit:

(b) Each public agency shall insure:

(2) That ... removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes ... cannot be achieved satisfactorily.

Least Restrictive Environment, 34 C.F.R. § 300.550(b)(2) (1992).

In *Roncker on Behalf of Roncker v. Walter,* 700 F.2d at 1063, the Sixth Circuit held that the [IDEA] does not require mainstreaming in every case but its requirement that mainstreaming be provided to the maximum extent appropriate indicates a very

**1568**

strong congressional preference. That decision also noted that where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. "Framing the issue in this manner accords the proper respect for the strong preference in favor of mainstreaming while still realizing the possibility that some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting." *Id.*

■ With regard to the consideration of educational benefit, this is a primary consideration with a child such as Gregory who has multiple and relatively severe handicaps. The definition of the term "educational benefit" is to be construed broadly. The word "benefit" should be read in a dual context. First it should be considered in an academic framework and the question should be asked whether a child will benefit educationally from a regular classroom setting. Second, the concept must be viewed from the nonacademic perspective. One of the many advantages of mainstreaming is the experience and behavioral models available from nonhandicapped children. In other words, although a handicapped child may not be able to absorb all of the regular educational curriculum, he or she may benefit from nonacademic experience in the regular educational environment. *Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1048 (5th Cir.1989) (accord *Roncker*, 700 F.2d at 1063) (as cited in *Greer v. Rome City School Dist.*, 762 F.Supp. 936, 941 n. 7 (N.D.Ga.1990)).

■ In addition the Court must observe that mainstreaming is not appropriate for every child with disabilities. *Learning Disabilities Ass'n v. Bd. of Educ. of Baltimore County*, 837 F.Supp. 717, 725 (D.Md. 1993). Placement of disabled children in special programs located in public schools is not necessarily evidence of discrimination under either the IDEA or the Rehabilitation Act. Section 1412(5) of the IDEA expressly recognizes that, in appropriate circumstances, disabled children may be placed in segregated programs. *Id.*, citing *DeVries v. Fairfax County School Board*, 882 F.2d 876, 880 (4th Cir.1989). These considerations surrounding whether and to what extent Gregory derives educational benefit from participation in particular programs is properly left to the expertise of the IEP staffing team to determine.

■ Plaintiff has also argued that a disabled child's least restrictive environment is his neighborhood school. The Court disagrees with this assertion as it unsupported in either statutory or case law. It is appropriate to reiterate that the statutory preference for placement at a neighborhood school is only that—and it does not amount to a mandate. For these reasons, the Court must conclude that Gregory has no right, as a matter of law, to receive his education at Evergreen High School. There is no basis under the IDEA or § 504 of the Rehabilitation Act for such a right of mandatory placement. Consequently, it must consider issues relating to the District's decision to put him in the Challenge Program at Golden High School and provide him transitional services there, and additional services in Evergreen. The Court must first observe that the two administrative hearings on this matter, which involved the same or substantially similar issues to those presented here, contained rulings providing for remand of the dispute for further consideration by the school officials in their IEP staffing with Gregory's parents. The remand was never completed because Plaintiff chose to seek judicial review of the question of Gregory's entitlement to attend Evergreen High School, and other issues. There are manifold issues which militate against the Court's consideration of issues concerning Gregory's proper placement for educational purposes and for transitional and other services. The Court is in no position to reconsider Gregory's "classification" as severely retarded, moderately retarded, or any other such classification for special education purposes. The school offi-

cials have conducted tests, and they are the appropriate authority to make decisions based on the results of such tests.

■■■ With regard to the location of his educational services, the Court will not assess the numerous factors which the school officials properly consider here: qualifications and certifications of teaching staff; ratio of students to teaching staff; accessibility or appropriateness of available physical facilities; and other considerations which the school officials properly consider in determining the appropriate placement (consistent with the State Plan as contemplated by the ALJ) of a child such as Gregory. The Court will accordingly give due deference to the factual findings of the ALJ (which are largely undisputed). As a matter of law, this Court cannot intrude into the domain of the school officials, especially in a situation such as the one before the Court where the factual issues underlying the Plaintiff's legal argument remain largely undetermined due to the fact that this dispute was never remanded to the school officials for a new IEP staffing. This fact may also support the granting of summary judgment in Defendant's favor because the orders from which the Plaintiff has appealed are not "final" in the context of raising issues on appeal in this court. With regard to Gregory's entitlement to education or services for an extended school year (ESY), the Court must conclude that this is also an issue properly left for resolution by the IEP staffing team. See ALJ decision at 8 n. 6, 14. See also *Association for Community Living in Colorado v. Romer,* 992 F.2d 1040, 1044 (10th Cir.1993).

Finally, concerning Plaintiff's claim for compensatory education, the Court observes that the IHO and ALJ were unable to determine whether Gregory had been denied a free appropriate public education as a result of the omission of transitional services in his IEP (until May 4, 1993). This was due to the fact that no full IEP had been developed and thus review was not possible. See ALJ decision at 7–8. The present situation is indistinguishable from that before the IHO and ALJ, and this Court, like the administrative decision-makers, will not engage in second-guessing the trained school personnel involved in Gregory's IEP staffing.

### C. The Americans With Disabilities Act

■■■ With regard to the parents' position that Gregory has the right to attend his neighborhood school, this issue as it pertains to the IDEA must be answered in the negative in light of the discussion and holding above. As the purported right derives from another source, namely the ADA, the Court must conclude that no such right is secured under the ADA. The implications of Plaintiff's asserted right to choose/right to reject which may be exercised by Gregory's parents would amount to an evisceration of the dense complex of federal and state laws and regulations surrounding the IDEA. The logical consequence of the parents dictating where the child will receive educational and transitional services is obvious and manifold—school districts would no longer be able to convene IEP staffings or develop programs with any control over the utilization or allocation of resources. They would instead have to react to parental demand concerning location, and presumably also the content of their educational or related services. Such consequences would result in financial constraints which would totally frustrate the underlying purposes of the IDEA.

■■■ While the Court is cognizant of the ADA and its special significance as a comprehensive anti-discrimination law for the disabled, it is not convinced that the ADA was either designed to lead or has otherwise led to any result which alters the pre-existing (and more specific) framework of the IDEA. Such work remains to be done at a future time. See the comments of John Gannon, acting chairperson of the National Council on Disability, before the House Subcommittee on Select Education and Civil Rights (Committee on Education and Labor), of March 10, 1994, concerning the reauthorization of the IDEA (FDCH Cong.Test., Mar. 10, 1994).

Defendant has also submitted some materials which are instructive on this point. Defendant cites to a statement by the Office of Civil Rights (Department of Education) in which it is made clear that the FAPE re-

quirement found in the § 504 regulations provide greater protection for students in elementary and secondary education than does the reasonable modification standard in the ADA. OCR Policy Letter, 20 IDELR 134, 135–38 (Oct. 7, 1993).

*D. The Claims Under 42 U.S.C. § 1983*

Plaintiff has included two references to § 1983 in the fifth and seventh claims for relief. No mention of the basis for these is contained in the body of the complaint. Section 1983 is not available as a means for vindicating the honor of aggrieved plaintiffs, but rather as a means for compensating substantial losses occasioned by constitutional violations. *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Unlike its criminal counterpart 18 U.S.C. § 242, § 1983 contains no state of mind requirement independent of that necessary to state a violation of the underlying constitutional right. *Parratt v. Taylor,* 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). Section 1983 protects against the deprivation not only of rights, privileges, or immunities secured by the Constitution and laws, it has also been construed to provide a cause of action for the violation of federal statutes. *Hill v. Ibarra,* 954 F.2d 1516, 1520 (10th Cir.1992), citing *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). While the Court cannot question whether the Plaintiff may assert claims or otherwise seek relief under the IDEA, ADA, or Rehabilitation Act, as contemplated in *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (where the Supreme Court set forth three considerations for determining whether a federal statute confers a "right" within the meaning of § 1983), there is no identifiable violation of any of the statutes on which Plaintiff bases his § 1983 relief. It is axiomatic that § 1983 creates no substantive rights, but only a remedy for violation of rights originating from other sources. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). Because there is no underlying violation of the statutory rights of Plaintiff here, there can be no violation of § 1983.

Summary judgment is properly entered in favor of Defendant on this issue.

Accordingly, for the reasons stated in this order, the Defendant's motion for summary judgment is **GRANTED** and the Plaintiff's motion for summary judgment is **DENIED.** Judgment shall accordingly enter in favor of Defendant. The remaining issues which stem from the reconvening of the IEP staffing are accordingly **REMANDED to the school authorities to, once again, schedule a staffing for the limited purposes contained in this order and more specifically set forth in the order of the Administrative Law Judge.** This shall be accomplished by reference to the determination of the ALJ, with the accommodation of Gregory's parents' schedules, and so forth.

In light of the above determination, Plaintiff's request for attorney's fees pursuant to the IDEA (20 U.S.C. § 1415(e)(4)(B), and the Rehabilitation Act (29 U.S.C. § 794a(b)) is **DENIED.**